Martell Builders, Inc., (a dissolved corporation) v. Commissioner. American Savings & Loan Association v. Commissioner.
Martell Builders, Inc. v. Commissioner
Docket Nos. 3700-62, 3701-62.
United States Tax Court
T.C. Memo 1964-250; 1964 Tax Ct. Memo LEXIS 90; 23 T.C.M. (CCH) 1501; T.C.M. (RIA) 64250; September 23, 1964
*90 Held, respondent erred in disallowing to petitioner Martell, as an ordinary and necessary business expense, a substantial portion of loan fees paid to American Savings & Loan Association in connection with a subdivision development. Held, further, American is not liable as transferee of Martell. Arthur B. Willis, 615 S. Flower St., Los Angeles, Calif., and Dudley M. Lang, for the petitioners. Michael P. McLeod, for the respondent. DAWSON
[Memorandum Findings of Fact and Opinion] DAWSON, Judge: In these consolidated proceedings respondent determined a deficiency in the income tax of Martell Builders, Inc., Docket No. 3700-62, for the fiscal year ended May 31, 1957, in the amount of $303,726.53, and asserted transferee liability against American Savings *91 & Loan Association, Docket No. 3701-62, in a like amount. The issues for decision are: (1) Whether respondent erred in disallowing as excessive a deduction claimed by petitioner Martell Builders, Inc., for payments of "loan fees" to American Savings & Loan Association with respect to a large subdivision development. (2) Whether American Savings & Loan Association is liable as transferee for receiving such payments. Findings of Fact Some of the facts have been stipulated and are hereby found accordingly. Martell Builders, Inc., was a California corporation with its office in Beverly Hills, California. Martell filed its Federal corporation income tax return for the fiscal year ended May 31, 1957, with the district director of internal revenue at Los Angeles, California. American Savings & Loan Association, with offices in Whittier, California, is an insured guaranteed capital stock company organized under the laws of the State of California on October 25, 1920, under the name Whittier Building & Loan Association. It is a domestic building and loan association under section 593(a) of the Internal Revenue Code of 1954. On April 30, 1952, the institution's *92 name was changed to Whittier Savings & Loan Association and on January 3, 1956, its name was changed to American Savings & Loan Association. The association will be referred to herein as American, whether before or after the changes of name. American filed its income tax returns for the calendar years 1956 and 1957 with the district director of internal revenue at Los Angeles, California. At all times pertinent hereto, all of the outstanding stock of American was owned by S. M. Taper and his wife. Although the great bulk of American's business has at all times been the lending of money on the security of real property, its key officers are experienced in land development and subdivision and in the construction and sale of single family residences. During the years 1955, 1956 and 1957, American, as a principal and for its own account, purchased three tracts of land that it subdivided and improved, constructing thereon, single family residences which it sold. The identification, number of units, total sales price, total cost, and profit with respect to each of the three tracts were as follows: Tract
No. of
Total
No.
Tract Name
Units
Sales Price
Total Cost
Profit
15937
Mission Wood, Granada
Hills, California
101
$1,551,455
$1,240,434
$ 311,021
16832
Hollydale Crest, Holly-
dale, California
96
1,411,145
1,111,397
299,748
17924
Pomona No. 2, Pomona,
California
213
2,946,292
2,367,342
578,950
Totals
410
$5,908,892
$4,719,173
$1,189,719
*93 On September 13, 1954, American, acting through its nominee, Residence Mortgage Corporation (hereinafter referred to as Residence), contracted with Vista, Inc., (an unrelated corporation, hereinafter referred to as Vista), for the purchase of some 75 acres of unimproved land in the Whittier area in Los Angeles County, California (later identified and hereinafter sometimes referred to as Tract 20503). Residence, a California corporation organized on November 7, 1949, is a licensed real estate broker with the State of California. At all times pertinent hereto, all of its outstanding stock was owned by S. M. Taper and his wife. By using Residence as its nominee, American sought to obtain a more favorable sale price for the land and to avoid involving American's name in any potential controversy in connection with zoning proceedings. There being numerous conditions contained in the contract of purchase whereby the transaction would not be completed if the land was not suitable for subdividing, Residence and Vista established a land purchase escrow covering Tract 20503 at American for the purpose of implementing the sale and purchase. At the time of such contract of purchase and opening *94 of escrow American planned to take title to the land and develop it on its own account as it had done in other instances. Prior to the close of the escrow, American, through its officers, employees, or agents, investigated to determine whether the land was suitable for subdividing and took the steps required to obtain approval by the Los Angeles County Planning Commission of a plan of subdivision. Such action by American entailed the following: Evaluation of the location of the property in the community, the demand for houses in the area, and the price range of houses in demand; study of the physical aspects of the land with respect to soil, grading, drainage and other engineering problems in consultation with a firm of engineers retained by American; investigation of existing easements, reservations, restrictions, covenants, rights of entry, and other items affecting legal title to the property; preparation of support for zone change from agricultural use to residential use; planning as to lot size, ingress and egress, streets and the like; investigation of the availability and cost of sewer facilities, water, gas, electricity, and other utilities; preparation of house plans and cost *95 estimates on construction; qualification of the subdivision for VA or FHA financing; and preparation of subdivision map and plan of subdivision and obtaining of approval thereof by city and county authorities. Approximately 15 months after the opening of the land purchase escrow, the plan of subdivision and the subdivision map for Tract 20503 were approved by the Los Angeles County Planning Commission and were filed with the Los Angeles County Recorder. By deed dated November 3, 1955, and recorded November 22, 1955, legal title to Tract 20503 was transferred by Vista to Residence. In July 1955, before the close of the land purchase escrow and initially unrelated to such purchase agreement, American (its name at that time was Whittier Savings & Loan Association) entered into agreements for the purchase of certain assets, including loans receivable, owned by Intervalley Savings & Loan Association (hereinafter referred to as Intervalley) and of certain assets, including loans receivable, owned by American Savings & Loan Association (its name was subsequently changed to Alliance Savings & Loan Association and is hereinafter referred to as Alliance), subject to certain liabilities, *96 including amounts owed to depositors of those associations. In accordance with applicable law and regulations, applications for approval of the transfers were filed with the California Savings and Loan Commissioner and with the Federal Home Loan Bank Board. Approval of the transfers was granted by the regulatory agencies, but in both instances the approval was conditioned upon the total reserves and capital stock of American being, at the date of consummation of the purchases, not less than 9 percent of the deposits, including the deposits assumed from Intervalley and Alliance. As of June 30, 1955, the total of American's reserves and capital stock was less than 9 percent of the total deposits on that date of American, Intervalley, and Alliance. In order to meet the reserve requirements necessary for the purchase of the assets of Intervalley and Alliance, American and its related corporations controlled by S. M. Taper and his family entered into a series of transactions involving Martell Builders, Inc., (hereinafter referred to as Martell), whereby American would be able to include immediately in its reserves income from the subdivision of Tract 20503 in the form of loan fees that *97 otherwise would not have been included as income until the subdivision was completed and the houses sold. The plan provided that Martell would acquire title to the tract and act as the builder of record with all of the funds, planning, management, and supervision to be provided by American. On December 12, 1955, S. M. Taper, who had owned all of the 1,000 outstanding shares of Martell since its incorporation on October 22, 1954, sold 600 shares of Martell stock to Henry K. Baalke (hereinafter referred to as Baalke) for $600 cash and 400 shares of such stock to John I. Casey (hereinafter referred to as Casey) for $400 cash. At the time Baalke and Casey purchased the stock, Martell's only asset was cash of $1,000 and its only liability was an account payable of $25. Immediately prior to purchasing the stock, Baalke had been employed by Biltmore Homes, Inc., (hereinafter referred to as Biltmore), as a field tract supervisor at a salary of $200 per week, and Casey had been employed by Biltmore as a purchasing agent at a salary of $700 per month. At all times pertinent hereto, all of the outstanding stock of Biltmore was owned by S. M. Taper and his wife. Neither Baalke nor Casey had *98 participated in subdivision work except as employees with specific assigned responsibilities. It was understood that they were to perform for Martell the same services that they had performed as employees of Biltmore. On the same date, December 12, 1955, escrow instructions to American were signed by officers of Residence and Martell for the purchase and sale of Tract 20503 for $427,000 with a down payment of $140,000 in cash and a promissory note secured by a second deed of trust payable to Residence for the $287,000 balance. The money for the down payment was borrowed from American, and the $287,000 note was paid by Martell in two equal installments on March 20, 1956, and May 10, 1956, out of funds from the subsequent construction loan from American. By an amendment to the escrow instructions, Residence further agreed to loan Martell $323,000, as and when required for the development of Tract 20503, on the security of a third deed of trust on the tract, evidenced by a promissory note. Only $20,000 of such amount was ever advanced by Residence, which was repaid by Martell on November 9, 1956, with interest of $200.02, at which time the note was cancelled. By deed dated December 14, 1955, and *99 recorded December 20, 1955, Residence conveyed title to Lots 1 to 314, inclusive, of Tract 20503 to Martell. At the time of such conveyance for a consideration of $427,000, Tract 20503 possessed a fair market value of approximately $679,800 as a result of the efforts of American in connection with the preparation and approval of the plan of subdivision and of engineering and other costs incurred. Concurrent with the opening of the escrow between Residence and Martell, on December 12, 1955, Martell entered into a letter agreement which provided that after the payment of all expenses, Martell would be left with a profit represented by trust deeds of a face value of not more than $12,285 and that the balance of the profit would be absorbed in fees or other payments to American or as might otherwise be arranged by Residence. The trust deeds to be retained by Martell were intended as consideration for its service of acting as subdivider of record. Martell further agreed, in a separate letter agreement, that during the period of construction of houses on the tract its officers-stockholders, Baalke and Casey, were to be compensated not more than $200 per week each including their expenses. *100 Also on December 12, 1955, Martell in a letter to Beverly-Grange Corp., (hereinafter referred to as Beverly-Grange) confirmed an agreement that Beverly-Grange would act as joint control for the purpose of receiving and disbursing all funds in conenction with the development of the land. Beverly-Grange was a California corporation, all of the stock of which was owned at all pertinent times hereto by S. M. Taper or his family. On December 15, 1955, American and Martell entered into an agreement whereby, among other things, American agreed to lend Martell $2,751,400 upon the security of Tract 20503 and the improvements theeron. The agreement provided for a separate loan with respect to each of the 314 lots in Tract 20503. Each loan was evidenced by a separate note, dated December 15, 1955, which was secured by a first trust deed. It was agreed that Martell would pay American interest of 6.6 percent and a service charge of $495,252, to be prorated against the 314 loans to be made by American so that each loan was chargeable with the sum of 18 percent of the individual loan. The amount of the service charge was based upon the estimate by the officers of American of the amount of cash *101 profit to be realized from the subdivision development of Tract 20503. American transferred $2,751,400 to an escrow account for the use of Martell on December 15, 1955, and received back from such account $495,252 of the total amount as a fee for such loan. American included said loan fee in its reserves by or as of January 3, 1956, the date on which it consummated the purchase of the assets of Intervalley and Alliance. The escrow statement dated January 3, 1956, shows disbursement of the construction loan as follows: Loan fee
$ 495,252.00
To Residence for land purchase
427,000.00
Interest on loan
102,028.20
Fire insurance
18,661.02
Title insurance
8,792.00
Miscellaneous
4,915.52
$1,056,648.74
To construction fund
1,694,751.26
$2,751,400.00
After the construction fund was set up by American, actual construction of offsite improvements and houses commenced. The contracts for the subdivision of land and construction of residences were left in Martell's name, and the sales agent was appointed in Martell's name. During the entire period of construction, Baalke and Casey, the only officers and employees of Martell, performed the same services they *102 had performed as employees of Biltmore, i.e., as tract superintendent and purchasing agent, respectively. All of the funds with respect to the subdivision were disbursed by the joint control, Beverly-Grange. On June 1, 1956, American made an additional loan to Martell of $408,320. There was no "points" charge or service charge by American on the additional loan. Also on that date American agreed to reduce the interest rate charged home purchasers from 6.6 percent to 6 percent to purchasers after that date. American received no payment for the reduction in the interest rate. American made a further loan to Martell of $41,600 on September 28, 1956, for which no service charge or "points" charge was made. As houses were sold in Tract 20503, cash proceeds from such sales were placed directly into escrow at American, with the net cash being deposited in the undisbursed loan account which was used for disbursements on the project. Notes, secured by second trust deeds of the purchasers of houses, were made payable to Martell. Martell immediately endorsed them in blank and delivered them to American to be held in escrow for final disposition upon the completion of sales of houses. American's *103 loans to Martell, totaling $3,201,320, were repaid as follows: Cash and promissory notes, secured by
first trust deeds, of purchasers of
homes upon close of sales escrows
$3,156,360
Promissory notes secured by second
trust deeds of purchasers
44,960
Total
$3,201,320 Except for the second trust deeds given Beverly-Grange as fees for its services, disposition of the trust deeds was as follows: (a) American received second trust deeds in the face amount of $608,810 between May 31, 1956, and May 31, 1957. (b) Martell received second trust deeds in the face amount of $12,030. The second trust deeds received by American were taken into the books of American at 50 percent of face value, or $304,405, and had a fair market value of that amount when received. It was agreed that Martell would receive the specified amount of second trust deeds whether or not the subdivision was profitable. The variance in the face value of the second trust deeds received by Martell ($12,030) and the face value referred to in the letter agreement ($12,285) was due to the denomination of the second trust deeds used for such purpose. American reported as income for the taxable years *104 1956 and 1957: (a) The loan fee retained from the loan
to Martell
$495,252
(b) One-half of the face value of
$608,810 in second trust deed
notes, less $44,960 amount of ac-
counts receivable from Martell
written off by American against
income
259,445
Total
$754,697 Martell sold the second trust deeds in the face amount of $12,030 to Biltmore for $4,210.50 and claimed a loss of $7,819.50 thereon on its income tax return for the fiscal year ended May 31, 1957. Baalke and Casey each received a $500 bonus from Beverly-Grange in December 1956. Commencing January 1, 1957, they became salaried employees of Bradley Estates, Inc., (hereinafter referred to as Bradley), a California corporation, all of the stock of which was owned by Barry Taper, son of S. M. Taper. After becoming employees of Bradley they continued to devote such time as was necessary to the affairs of Martell in connection with supervising repairs and handling other post-sale administrative matters of Tract 20503. In May 1957 Martell paid Bradley $4,000 as reimbursement for the services of Baalke and Casey and as consideration for Bradley's assuming all future administration and expenses, and paid *105 Baalke and Casey bonuses of $1,200 and $600, respectively. Pursuant to appropriate action by its stockholders and board of directors, Martell was dissolved on June 14, 1957. The following amounts were distributed in cash to Baalke and Casey in complete liquidation of Martell: June 4, 1957
June 19, 1957
Baalke
$ 600
$19.71
Casey
400
13.14
Total
$1,000
$32.85 No part of Martell's $1,000 cash, its only asset, was ever used in the subdividing of Tract 20503. In its income tax return for the fiscal year ended May 31, 1957, Martell reported all of the income from the sale of houses on Tract 20503 and deducted therefrom as cost of goods sold all of the expenses incurred in developing the tract, including the loan fee retained by American and the second trust deeds transferred to American. The gross profit from sales thus reported was $12,030, the face value of the second trust deeds retained by Martell pursuant to the letter agreement entered into with Residence, American's nominee. In determining the $303,726.53 deficiency against Martell for the fiscal year ended May 31, 1957, respondent gave the following explanation for the adjustment: Included in *106 the cost of sales deducted on your return were loan fees paid to American Savings and Loan Association in the amount of $754,697.00. It is held that the transactions with American Saving and Loan Association were not arm's length and that a deduction for loan fees is allowable in the amount of $160,066.00, based on 5 percent of total loans from American Savings and Loan Association. The excessive amount deducted of $594,631.00 is disallowed. Respondent's notice of transferee liability issued to American asserting transferee liability of $303,726.53 contains the following: The records of this office indicate that Martell Builders, Inc., has been liquidated and that assets were transfered to you. The above-mentioned amount represents your liability as transferee of assets of Martell Builders, Inc., for a deficiency of income tax due from Martell Builders, Inc., for the taxable year ended May 31, 1957. The arrangement between Martell and American resulted in a fair division of profits from the subdivision development considering their respective contributions to the venture. The loan or service fees paid by Martell to American were ordinary and necessary and reasonable in amount *107 when compared to similar fees charged other experienced builders in fully negotiated arm's length transactions. Opinion It is important to note at the outset the significance of American's status as a domestic building and loan association under section 593(a) of the Internal Revenue Code of 1954. [1] Pursuant to the provisions of that statute, American was entitled to deductions for additions to bad debt reserves, in addition to other ordinary and necessary business deductions, which were great enough to offset all of the income of American, including that realized from the development of Tract 20503, during the period in issue. Consequently, even though American reported in its income tax returns for 1956 and 1957 all of the $754,697 amount upon which respondent based the $303,726.53 deficiency against Martell, it paid no taxes for those years. Thus the effect of respondent's attempt to assert transferee liability against American (the stockholders of Martell having received only $1,032.85 upon the liquidation of the corporation) is to tax American, indirectly through transferee liability, on a substantial part of the same income previously reported by American *108 but which could not be taxed to it directly. Of course, the question of American's liability as a transferee depends initially upon whether there is any deficiency in the income tax of Martell. The record here clearly establishes, and respondent acknowledges, that American entered into the series of agreements with Martell for a valid business reason. That reason, which had nothing to do with taxes, was to achieve a buildup of reserves in order to secure approval by the California Savings and Loan Commissioner and by the Federal Home Loan Bank Board of the acquisition of two other savings and loan associations. However, respondent contends that one of American's prime concerns was to eliminate most of the taxes on the development. We think a look at the alternatives available to American at that time shows that taxes had practically nothing to do with the arrangement with Martell. American originally intended to develop Tract *109 20503 on its own account. The arrangement with Martell was intended to upset this original course as little as possible while at the same time accelerating the realization of income for purposes of increasing American's reserves. In other words, the plan was simply for American to retain the profit potential it had already acquired for itself. There was never any question of transferring that right to profit to anyone. American could have legally developed the tract itself so long as its real property investments remained below 5 percent of its assets. However, under California law then in effect American could not legally loan money to a majority shareholder or, without the consent of the California Savings and Loan Commissioner, to a corporation in which he owned or controlled a majority of the stock. Cal. Fin. Code, Secs. 7177 and 7178. Therefore, American could not finance the subdivision if the property was owned by a development company of which S. M. Taper was a majority stockholder. The alternatives available were: 1. Retain and develop the tract, waiting until completion to realize profits. This alternative would not have accomplished an immediate increase in reserves for *110 purposes of obtaining approval of the acquisition of the other two savings and loan associations. 2. Transfer the tract to a development company in which S. M. Taper was a majority shareholder. By this approach American would have been required to relinquish the financing. 3. Transfer the tract to a company in which Taper had no proprietary interest, which was the course chosen. In order to retain the profit potential in the subdivision which American had brought along to the point of recording the Subdivision Map, and also to finance the development and maintain the association's advantageous position with respect to the ultimate financing of the individual home purchases, American transferred the tract to a corporation (Martell) in which S. M. Taper owned no stock. This was done under an agreement providing for the division of profits. American concluded, as a matter of business judgment, that no other course made any sense at all. The reason the agreement with Martell for the bulk of profits to go to American was that the right to profits belonged to American in the first place. The question was never whether American would report the profits; the only question was how soon *111 it would be able to do so. The narrow issue, as framed by the deficiency notice and the pleadings in the Martell case, is whether the so-called loan fees paid to American were reasonable under the particular circumstances here involved and constituted fully deductible business expenses. This is purely a factual question which we think should be decided in favor of petitioner Martell. The amount which Martell deducted in reporting its income from the subdivision included the amounts, representing all of the profits from the subdivision except the second trust deeds given to Martell, to which American was entitled under the December 12, 1955, agreements. It is clear that the basic agreements created binding financial obligations and that payments on such enforceable obligations are ordinary and necessary expenses. Louis E. Wakelee, 17 T.C. 745 (1951). The deductibility of an item is not affected by the fact that the amount is based upon a percentage of profits. Edwin J. McEnaney, 3 T.C. 552 (1944); Monroe Sand and Gravel Co., 36 B.T.A. 747 (1938); and Louis C. Rollo, 20 B.T.A. 799 (1930). Nor is deductibility of an item prejudiced *112 by the fact that the taxpayer may have given the deduction a designation not fully describing the item. Edwin J. McEnaney, supra; Louis C. Rollo, supra.And it makes no difference to us whether the amounts received by American are designated "American's share of profit from subdivision," rather than "loan fees," simply because the name given the deduction does not affect its deductibility. Viewed from one angle, we are convinced that the amounts paid to American reflected a fair and reasonable division of profits from the development in relation to the relative contributions made by American and Martell. Martell's contribution to the subdivision was merely its corporate existence for the purpose of acting as title holder and subdivider of record. Martell, through its officers, Baalke and Casey, possessed neither the experience and skills nor the employees and facilities necessary to accomplish the residential development of Tract 20503. The work of Baalke and Casey in this project was no different from their work as employees in other Taper projects. They did not participate in the management or the decision-making of the development. All of the preliminary *113 arrangements regarding planning, zoning, platting, and financing had been accomplished by American before Martell ever came into the picture. Moreover, Martell assumed no risk because it was to receive approximately $12,000 in second trust deeds regardless of the success of the project. Nor was it in a position to participate in the profits. At no time did Martell have the custody or control, or the right to custody or control, of any of the borrowed funds or any of the cash or second trust deeds realized from the sale of residences except to the extent of trust deeds in the face amount of $12,030. In essence, Martell brought nothing to the subdivision project which was not already there by virtue of the assets and efforts of American. The record reveals that the material factors necessary to the success of the project were American's. American possessed the working capital, the skilled officers and employees, the experience and know-how, and assumed all the risk. Practically every aspect of the development of the tract was in American's contro at all times. A case in some respects analogous in its facts is Worth Steamship Corporation, 7 T.C. 654 (1946). It involved *114 some individuals who negotiated the purchase of an interest in certain Yugoslav ocean vessels, forming a Panamanian corporation to receive title. Thereafter, one of the ships was put under U.S. registry and title was taken in the name of one of the purchasers. Later, a third individual was brought in and a joint venture agreement was made orally. The plan was developed for two of the individuals to operate the American ship on behalf of the three joint venturers and for this purpose Worth Steamship Corporation was organized. Monthly reports were submitted by Worth Steamship Corporation to the joint venturers showing all receipts and disbursements for the account of the beneficial owners and, after deducting its management fee of $1,800 per month, these statements showed the cash balance due to the joint venturers. From time to time the corporation remitted to the joint venturers sums of money representing the excess of the receipts over disbursements from the operation of the American ship. On these facts, we held that the corporation was not taxable on the net income from the operation except for the monthly management fee. The case is similar to the instant case because the corporation *115 transmitted the bulk of the profits to the primary parties in the venture and the corporation withheld a relatively nominal amount for itself. The fact that the corporation actually received for a time amounts in excess of what it was to keep for itself was not permitted to determine the tax consequences of the transaction. As in any joint venture, the parties determined what their functions would be in the transaction and determined the allocation of the proceeds. There is a clear analogy in this instance to the Worth Steamship case since the parties understood at the beginning the limits of what Martell would receive. Anything over and above the $12,030 in second trust deeds clearly belonged to American by virtue of the basic agreements between the parties. Viewed from still another angle, it is our opinion that the amounts paid as loan fees were reasonable and fully justified. When all relevant factors are considered the 18 percent loan charge was, in actuality, reduced to a 9.47 percent charge. The original loan of $2,751,400 was specifically subject to an 18 percent charge. There was no loan or "points" charge on the additional loan of $408,320 made on June 1, 1956. There was *116 no loan or "points" charge on the additional loan of $41,600 on September 28, 1956. Thus on the total loans of $3,201,320 made to Martell by American, the loan charge was $495,252, which is 15.47 percent of the total loan. On June 1, 1956, American agreed with Martell to reduce the interest rate from 6.6 to 6 percent on loans to individual buyers after that date. American received no additional consideration for this reduction in the interest rate. The reduction in interest rate was to meet the competition of other residential tracts which were offering residences with a 6 percent interest rate on the loan. A reduction of 0.6 percent in the interest rate on the "take-out" loans (i.e., the loans to the individual purchasers of residences, the proceeds of said loans being used, to the extent necessary, to pay off the construction loan and hence are "take-outs") is considered in the mortgage banking business as the equivalent of a six point, or 6 percent, reduction in the initial loan charge. The net result is that the ratio of the amount charged as loan fee to the total loan, adjusted to reflect the effect of the 0.6 percent reduction in interest rate on the take-out loans, is *117 9.47 percent. Respondent is seeking to increase Martell's taxable income because the fees received by American in cash and in second trust deeds exceeded what respondent regards as a fair charge for monies loaned by American. We cannot agree with this position. In our judgment the loan fees paid to American by Martell were reasonable when compared with loan fees charged by other savings and loan associations. The amount of the loan fee charged represents the lender's appraisal of the risk and exposure and of the services involved in the loan transaction. A lender's appraisal of the risk is governed by his good judgment and experience and takes into account such matters as the current interest rate, the location of the tract, the price range of the homes, the builder's experience, the amount of money to be put up by the builder, and in general an evaluation of the project itself. Moreover, the law of supply and demand plays its role. Viewed purely as service fees, we regard the payments made by Martell to American as reasonable. This is borne out by the fact that American has charged comparable loan fees to parties who were in no way connected with American or S. M. Taper. An *118 example of loan fees charged in an arm's length transaction which were even higher than the fees charged Martell is found in a loan transaction with a builder named Russell Pru. In this instance, which took place in 1955, the builder located the land, put up some money and applied to American for financing. On a loan with interest at the rate of 7 percent (the loan to Martell was at 6.6 percent) the negotiated loan fee was 14 points. If the interest rate had been lower than 7 percent, the loan fee would have been higher. Taper testified that savings and loan associations will frequently aid a builder in acquiring land in an area which is expected to grow and develop, and in such instance will command a fee commensurate with the risk involved in holding the particular land for a period of time. The fee may take the form of points and is then accounted for as a loan fee because the transaction is basically one of financing the purchase of the land. This approach is illustrated by the Russell Pru loan. Alternatively, the association may take title to the land and resell it to the builder at a gain. This approach is illustrated by a case involving Berkeley Savings and Loan Association, *119 where an experienced builder had an option to acquire land in Hayward, California. The association acquired 80 acres of land at $4,725 per acre and charged the builder a fee of 32 percent. Another example occurred in a transaction in San Jose, California, between Harmony Dale Builders and Pioneer Investor Savings and Loan Association in which the association acquired the land, assisted in the engineering and other work, and resold the land to the builder at a profit of $400 per lot. Pioneer Investor Savings and Loan also acquired land which later became known as Bel Air Village and resold it to a very large builder known as Brandon, receiving an "option" fee of 20 percent interest per year. In these examples the fees charged were higher than the fee charged Martell in this case. What American received was certainly not out of line as loan fees. Accordingly, we hold that respondent erred in disallowing to Martell the deduction of the loan fees paid to American. There being no deficiency against Martell, it follows that American is not liable as transferee. Decisions will be entered for the petitioners. Footnotes
1. The effect of section 593↩ is a tax deferment rather than a tax exemption since qualifying financial institutions are permitted additions to reserves for bad debts only so long as the maximum reserve permitted under such section has not been reached.